ALFRED H. TOLZMAN ET UX. *v.* DAVID H. GWYNN, TRUSTEE ET AL.

[No. 737, September Term, 1973.]

*Decided August 23, 1974.*

The cause was argued before MOYLAN and POWERS, JJ., and ROBERT F. SWEENEY, Chief Judge of the District Court of Maryland, specially assigned:

*John H. Hessey, IV* for appellants.

*David H. Gwynn* for appellees.

POWERS, J., delivered the opinion of the Court.

These appeals involve the right to foreclose the lien of a deed of trust of real estate in Baltimore County, and a determination of the amount secured by the lien. The proceeding in the Circuit Court for Baltimore County from which these appeals were taken is but a postlude to the main drama of several acts, played in Prince George's County, with one scene presented in Annapolis.

An understanding of the prior transactions and events is necessary to a solution of the legal issues now presented. Rudolf Walti and Alfred H. Tolzman were the principals in United Leaf Tobacco Corporation, located in Upper Marlboro. In 1967 and 1968 the company borrowed a total of $70,000.00 from Mrs. E. Lucille McCauley on unsecured notes. There may have been an intention to give security for the debt, but none was given at that time.

The corporation also borrowed funds from Suburban Trust Company on two notes, one dated 1 July 1968 for $39,000.00 and one dated 30 December 1968 for $75,000.00. Walti and Tolzman, and their wives, signed both notes as endorsers and guarantors. On 14 April 1969, when the earlier note had been reduced to $34,500.00 and the later one remained at $75,000.00, Walti and Tolzman and their wives

gave additional security for the existing indebtedness to the bank by a deed of trust conveying to trustees named by the bank the Walti residence property, located in Prince George's County, and the Tolzman residence property, located in Baltimore County. Apparently neither was subject to any existing encumbrance at that time. The deed of trust was recorded in both counties.

By a mortgage on their residence property dated 10 June 1970 Walti and his wife gave Mrs. McCauley security for the corporation's indebtedness to her. The lien of this mortgage was junior to the lien of the deed of trust securing the notes at the bank.

In October 1971 Mrs. McCauley, learning that the bank had commenced proceedings to foreclose its deed of trust, purchased the notes held by Suburban Trust Company for the balances then due, plus accrued interest. Quite obviously she did this to protect her junior lien on the Walti property. By a deed of appointment she substituted her attorney, David H. Gywnn, for the trustees originally named by the bank.

Foreclosure of the junior mortgage held by Mrs. McCauley on the Walti property was then instituted by Mr. Gwynn, as the attorney named in the mortgage. The advertisement of sale stated that the property would be sold subject to a first trust, on which the balance due, announced at the time of sale, was $53,430.87. Sale was held on 15 November 1971. The property was sold to Mrs. McCauley on her bid of $54,000.00.

An apparent misunderstanding of the proper application of the $54,000.00 sale price arose, and was ultimately resolved by the Court of Appeals in *Tolzman v. Gwynn,* 267 Md. 96, 296 A. 2d 594 (1972). Mr. Gwynn reported that the property was offered, subject to the balance due on the first trust of $53,430.87, and sold for $54,000.00, "including the balance owed on the first trust". The sale was ratified by the court. In his draft of an account suggested to the auditor Mr. Gwynn took the position that the true net selling price was $569.13, the amount by which the bid exceeded the first trust balance. The auditor disagreed, taking the position that

what was sold was the equity after the first lien, and that it sold for $54,000.00. His account and report reflected that view. The balance due Mrs. McCauley on her second mortgage debt was audited at $65,095.84. After costs and expenses allowed in the audit, the net result was that the sale at $54,000.00 left a deficiency still due Mrs. McCauley of $16,071.19.

Mr. and Mrs. Tolzman filed exceptions to the auditor's account, contending "that the $54,000.00 of sale proceeds, after expenses, should have been applied in reduction of the debt of $53,430.87 due under the first trust". 267 Md. at 99. The lower court ultimately ratified the account as stated, and the Tolzmans appealed. With a modification as to commissions allowed, the Court of Appeals affirmed the order ratifying the auditor's account, including the deficiency as stated. The Court said, at 99:

> "The simple fact is, however, that he [Mr. Gwynn] was foreclosing the second mortgage, not the first deed of trust. The advertisement of sale clearly stated, as it should have, that the property was being sold subject to the senior debt, which was in default, and could not be assumed, see *Diliansz v. Klatch*, 247 Md. 315, 318, 231 A. 2d 20 (1967). It was imperative that the net proceeds of sale be applied in reduction of the debt secured by the second mortgage, and nowhere else."

After having filed in Prince George's County a release of the former Walti property from the lien of the deed of trust, the substituted trustee instituted in the Circuit Court for Baltimore County the case now before us, to foreclose that deed of trust against the Tolzman property. The Tolzmans filed a petition to enjoin the sale, asserting generally the position taken by them in their exceptions to the auditor's report in Prince George's County upon which a final ruling had not yet been made. The court enjoined the sale, subject to further order.

This case remained dormant for more than a year, during which the Circuit Court for Prince George's County

overruled the exceptions and ratified the auditor's report, and the Court of Appeals affirmed. During that time also, Mrs. McCauley privately sold the former Walti property for a gross price of $85,000.00.

In March 1973 Mr. Gwynn, the substituted trustee, petitioned the court to dissolve the injunction and let the foreclosure proceed. An answer was filed, a hearing held, and on 3 August 1973 the chancellor filed a memorandum opinion, followed by a decree on 10 September 1973. The decree dissolved the injunction and permitted the trustee to proceed with foreclosure, and fixed the amount of the debt secured by granting to Mrs. McCauley a judgment against the Tolzmans for $38,502.06, with interest from 9 December 1971, and assessed costs against the Tolzmans. Although it would not otherwise have been an issue at that stage of the case, both sides introduced evidence, and briefed and argued the question of the balance due, and agreed that the chancellor should make a finding on the question in order to eliminate further proceedings.

Both sides appealed from that decree.

The Tolzmans contend here:

1. That Mrs. McCauley's release of the Walti property from the lien of the deed of trust was not a legitimate release, but was a forbidden impairment of collateral which discharged them as guarantors.

2. That they have a right of contribution against the Waltis, their co-guarantors, for a proportionate share of the debt due, and to enforce that right of contribution they should have an equitable lien on the proceeds of the sale of the Walti property.

3. That they are discharged by the trustee's breach of his duty, on default, to sell the property in one parcel.

4. That if any sum is due Mrs. McCauley, it cannot exceed $16,071.19, the deficiency suffered by her in the foreclosure of her junior mortgage on the Walti property.

Mr. Gwynn, trustee, as cross appellant contends only that the lower court incorrectly determined the amount of the indebtedness.

The two notes originally payable to the bank, later secured by the deed of trust here involved, and still later purchased by and endorsed to Mrs. McCauley, each contained on its face, above the signature of the corporate maker, the following clause:

"The undersigned and all endorsers, sureties and guarantors hereof jointly and severally waive presentment for payment, demand, notice of nonpayment, notice of protest, and protest of this note, and all endorsers, sureties, and guarantors hereof consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by the Bank with respect to the payment or other provisions of this note and to the release of the collateral, or any part thereof, with or without substitution and agree that additional makers, endorsers, guarantors, or sureties may become parties hereto without notice to them or affecting their liability hereunder."

On the back of each note, immediately above the individual signatures of Mr. and Mrs. Tolzman and Mr. and Mrs. Walti, this provision was printed:

"In addition to the liability as endorsers, which the undersigned hereby assume, and intending to be legally bound, the undersigned (and if more than one, each of them jointly and severally) (a) hereby become surety and guarantor to the SUBURBAN TRUST COMPANY, its successors, endorsees and assigns, for the payment of the within note; (b) consent (1) that the Collateral may be exchanged; surrendered or sold from time to time, (2) that the payment of the note, or any of the liabilities of the Maker thereof, or of any Collateral, may be extended in whole or in part, and (3) that any of the provisions of the note may be modified; all without notice to and without affecting the liability of the undersigned as endorser, surety and guarantor; and

(c) authorize judgment by confession against each of us under the terms on the face of the note."

To support their contention that Mrs. McCauley's release of the Walti property from the lien of the deed of trust discharged them as guarantors, the Tolzmans rely upon Code, Art. 95B (Uniform Commercial Code), § 3-606. The section provides, in part:

"(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

(a) Without express reservation of rights releases or agrees not to sue any person against whom the party has to the knowledge of the holder a right of recourse * * *; or

(b) Unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse."

The Official Comment under § 3-606 states that one of the purposes of the new matter is to make it clear that:

"Consent may be given in advance, and is commonly incorporated in the instrument; or it may be given afterward. It requires no consideration, and operates as a waiver of the consenting party's right to claim his own discharge."

The binding effect of the advance consent contemplated by § 3-606 is made even more clear by the provision in Art. 95B, § 1-102, which says, in part:

"(3) The effect of provisions of this article may be varied by agreement, except as otherwise provided in this article and except that the obligations of good faith, diligence, reasonableness and care prescribed by this article may not be disclaimed by agreement but the parties may by agreement determine the standards by which the

performance of such obligations is to be measured if such standards are not manifestly unreasonable."

In *Etelson v. Suburban Trust Co.*, 263 Md. 376, 283 A. 2d 408 (1971) the Court of Appeals considered both of these sections of the Uniform Commercial Code. The release of collateral there was involuntary, through an oversight, but the law is the same. The Court said, at 379-80:

"In the instant case, however, the Etelsons by agreeing to the broad language of the endorsement limited the protection to which they might have otherwise been entitled under the UCC. It is clear from the express wording of the endorsement that the Bank could have released the collateral at any time without notice to the Etelsons and without the release affecting the Etelsons' obligation to pay. It would be illogical to rule that the Bank had a duty to file the financing statement and its failure to do so released the endorsers, when under the endorsement it could have released the collateral with impunity.

"The UCC recognizes that there may be times where parties to an instrument may choose to alter the general provisions of the UCC to meet their particular purposes. Article 95B, § 1-102 (3). The appellants did not attack the propriety of the endorsement in the court below nor do they on appeal. Additionally, it appears from the record that the Bank was the party which sought the collateral as security for its own benefit and the taking of the chattel mortgage as security for the loan was not part of any inducement extended to the Etelsons to obtain their endorsement. In fact, as guarantors of 'payment' of the loan their liability is indistinguishable from that of a co-maker. See Official Comment, Article 95B, § 3-416."

Appellants argue that their previous consent to a release of collateral is not effective in this case because, they say,

when Mrs. McCauley released the Walti property from the deed of trust it was a release only in form, but in substance she deeded the property to herself. And they still argue in the face of *Tolzman v. Gwynn, supra,* that the proceeds of the sale of the Walti property by foreclosure of the second mortgage should be applied to the reduction of the debt secured by the deed of trust.

A further contention of the appellants is that they have a right of contribution against the Waltis, and are entitled to an equitable lien on the proceeds of sale of the Walti property in order to enforce their right of contribution. Their lien, they say, should follow the selling price of the Walti property, which they state to have been either $107,430.87 (in the foreclosure sale), or $85,000.00 (in the subsequent private sale). They argue that Mrs. McCauley is trying to obtain payment of the same debt twice — that this approach cannot be permitted in law or in equity, as it would constitute unjust enrichment.

It is indeed regrettable that any person should ever suffer a loss of his money or his property. But the ways of business are such that the ventures which are designed to create wealth sometimes consume it instead. The laws that apply to business and commercial relationships are myriad — they enable a person to engage in almost any kind of transaction he chooses, from the rankest speculation to near absolute security. The rewards are generally commensurate with the risk.

The rules of law are detailed and certain, and controversies growing out of business transactions ordinarily may be resolved by applying those rules of law to the facts. But when the controversy arises in a court of equity, that court may ignore form and look to substance, applying equitable principles to accomplish substantial justice. In *Aiello v. Aiello,* 268 Md. 513, 302 A. 2d 189 (1973), a case similar to the case before us in that it involved claims by an alleged accommodation maker of discharge and of an equitable lien to enforce a right of contribution, the Court of Appeals said, at 519:

"This right of contribution can be enforced in

several ways. Among them, and perhaps preferable, the paying party may obtain from the mortgagee or his assigns an assignment of the mortgage, *Hogan v. McMahon, supra* at 203. If that is not possible, he may assert a right of subrogation as a surety of the others as regards their share of the debt and, subject to the intervening rights of any innocent third party, acquire and enforce an equitable lien for the amount due him. In such a situation 'courts of equity do not hesitate to adapt their methods to the exigencies of justice or to protect the equitable rights of those concerned' and compel the ultimate payment of a debt by those who in equity and good conscience ought to pay it. *Meyers v. Loan & Sav. Assn, supra,* 139 Md. at 613."

The process of reasoning urged by appellants is like a game of hop scotch, now invoking application of a strict rule of law; then a broad principle of equity, to achieve the desired goal. We think that consistent pursuit of either avenue compels a result unfavorable to appellants.

A strictly legal view of the series of transactions is this: The Waltis and the Tolzmans subjected their respective residence properties to the lien of a deed of trust to provide additional security for two promissory notes of which they already were endorsers and guarantors. The Waltis later subjected their property to the additional lien of a mortgage to secure another debt. The second mortgage was foreclosed, and the equity in the Walti property above the senior lien was sold for $54,000.00. The holder of the senior lien released the Walti property from that lien, as the parties had agreed the holder may do. That the purchaser of the Walti property later sold it for a gross price of $85,000.00 is irrelevant. Once the sale was ratified, the purchaser could do with it what she pleased. The lien of the deed of trust continued to be a lien on the Tolzman property, securing notes upon which the balance is somewhat upwards of $53,000.00, plus interest. The trustee has the right to sell the property to satisfy that debt.

Rather than reach the result just postulated, we prefer, as did the chancellor below, to view the series of transactions in the light of applicable principles of equity, as the best way to accomplish substantial justice.

We agree with appellants that Mrs. McCauley should not collect the same debt twice; and that she should not be unjustly enriched. But neither should she suffer a loss which is within the power of those responsible for the debts to recompense.

Looking at the equities, we see that Mrs. McCauley loaned $70,000.00 to United Leaf Tobacco, with no potential reward but interest on her money, and with poor security for its repayment. She later acquired a degree of security, in the form of a junior mortgage on the residence property of one of the principals in the debtor company. Still later, for no purpose but to protect the debt already owed to her, she paid something in excess of $53,000.00 to purchase the notes secured by the senior lien. Equity to Mrs. McCauley would require that she be repaid $123,000.00, with interest.

The amount due to Mrs. McCauley should have been fixed at the amount she had laid out, with allowance for interest and chargeable costs and expenses, less the net proceeds of the sale of the Walti property, and any payments she received, the whole not to exceed the balances due, with interest, on the notes secured by the deed of trust she now seeks to foreclose.

As cross appellant the trustee says that in fixing the amount due, the chancellor erred in three respects; in determining the balance due, in the date from which interest runs, and in failing to allow an attorney's fee as provided in the notes.

The chancellor's approach was, in effect, what we have said it should be. He correctly ignored the claim of an attorney's fee. The provision in the notes for a 10% fee applied only if judgment were entered by confession. That course was not followed here. The deed of trust provides for a trustee's commission, which may be allowed in the audit. In arriving at the principal sum of $38,502.06 due, the chancellor stated he was recognizing the *net proceeds* of the

subsequent sale of the Walti property, but he used the figure of $85,000.00, which was the *gross* selling price. There was evidence that the net was $75,000.00.

With adjustment for this inadvertent use of the wrong figure, the principal debt due would be $48,502.06. Both sides agree here that the Tolzmans are entitled to a reduction of $609.04, the amount of costs awarded them by the mandate in *Tolzman v. Gwynn.* We modify the judgment below, and enter it for $47,892.42. In effect, appellants receive the benefit of an equitable lien on the amount by which the net proceeds of the ultimate sale of the Walti property exceeded the mortgage against it.

The decree provided that interest be calculated on the principal from 9 December 1971, the date the sale under the second mortgage was ratified. Interest was already calculated on the first trust notes to the time of sale. While the relation between the first trust notes and the second mortgage foreclosure is not a direct one, we see no reason to change the date fixed by the chancellor.

There is no merit in appellants' contention that the trustee has a duty to sell these two geographically separated parcels of real estate as one parcel. Aside from the obvious impossibility of doing so, only one parcel now remains subject to the lien of the deed of trust.

> *Decree modified by changing the amount of the judgment from $38,502.06 to $47,892.42, and, as modified, affirmed.*
>
> *Appellants and cross appellees to pay costs.*